IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

H&R BLOCK, INC., )
 )
       Plaintiff, )
 )
vs. ) Case No. 03-0904-CV-W-ODS
 )
EVANSTON INSURANCE CO., )
AMERICAN INTERNATIONAL )
SPECIALTY LINES INSURANCE CO., )
and LEXINGTON INSURANCE CO., )
 )
       Defendants. )

<u>ORDER AND OPINION GRANTING IN PART AND DENYING IN PART CROSS
MOTIONS FOR SUMMARY JUDGMENT</u>

Pending are cross motions for summary judgment. Defendants' motions (Doc. Nos. 209, 214 and 215) are granted in part and denied in part. Plaintiff's Motion (Doc. No. 211) is denied.

I. <u>BACKGROUND</u>

A. <u>The Primary Policies</u>

Plaintiff obtained a professional liability policy from Mutual Indemnity Ltd. ("Mutual") that provided coverage from August 20, 1990 to August 20, 1991. The policy was extended annually, with the last extension expiring on August 20, 1994. This policy has been described as a "fronting policy" in that Plaintiff paid Mutual a fronting fee for the policy, and self insured the entire $1 million in coverage. Plaintiff paid Mutual a $100,000 "premium" that was retained by Mutual to pay losses under the policy and posted a $900,000 letter of credit to secure the remainder of the coverage. Plaintiff was further obligated to pay Mutual a "retroactive premium" in an amount equal to any claims paid under the policy. Thus, Mutual was never obligated to pay any sums under

the policy and the letter of credit was never utilized. In fact, Mutual did not even process the claims; claims were processed (and paid) by Plaintiff.

With the expiration of the last Mutual policy, Plaintiff obtained coverage from 1994-95 through 1997-98 through National Union or American Home, both of whom were affiliates of AIG. Like the policy Mutual issued, these policies were fronted by Plaintiff and Plaintiff administered its own claims – so any amounts paid under the policies were actually paid by Plaintiff and not by the insurance companies.[1]

These polices (hereafter "the Primary Policies")[2] contained virtually identical language describing the extent and nature of their coverage. Each policy declared that Plaintiff would be reimbursed "for amounts you and other protected persons are legally required to pay to compensate others for loss that results from an error, omission or negligent act committed in the conduct of your business. . . . The business activities that are covered are shown in the Declarations as 'Specified Operations.'" "Specified Operations" consisted of "[t]he performance of tax services, including, but not limited to, answering questions concerning taxes; providing tax information; preparing tax returns; filing tax returns in the traditional manner prepared by an insured or others; processing applications for refund anticipation loans; . . . ." The Primary Policies also provided for reimbursement "for attorney's fees you incurred defending any suit brought . . . for covered claims, even if a suit is groundless or fraudulent. We will also reimburse you

---

[1]Interestingly, National Union and American Home were reinsured for the entire $1 million (even though they could never be obligated to pay any claims with their own money) by Companion Insurance Ltd., an insurer based in Bermuda that was owned by Plaintiff and managed by AIG.

[2]The Court can't help but wonder whether the Primary Policies qualify as insurance. Certainly, the documents issued by the insurance companies certify or assure that a certain sum of money is available to pay certain types of claims, but the arrangement seems more like an escrow or trust account than an actual insurance policy – with the party depositing the money deciding when and how much to pay itself.
That said, the Court has no doubt Defendants possessed sufficient bargaining power to insist upon examining the Primary Policies before issuing excess coverage, as well as sufficient acumen to appreciate the implications and consequences of the Primary Policies' provisions.

2

for the costs of defending the suit." However, the Primary Policies cautioned (in bold letters) "**We have no duty to defend you against any suit.**" Finally, each Primary Policy covered "claims first made against a protected person while this Policy is in effect. The claim must be based on a wrongful act that occurred while this Policy was in effect." However, claims based on wrongful acts occurring before the effective date of each Primary Policy were covered if the person involved "had no knowledge of the prior wrongful act on the effective date of this Policy, nor any reasonable way to foresee that a claim might be brought."

## B. The Excess Policies

In addition to the Primary Policies, Plaintiff obtained excess coverage (collectively "the Excess Policies"). Defendant Evanston Insurance Company ("Evanston") issued Plaintiff an Excess Liability Insurance policy that provided excess coverage from August 20, 1992 to August 20, 1993. Evanston annually issued Plaintiff a new policy that provided excess coverage, with the last such policy covering the period from August 20, 1997 to August 20, 1998. (Collectively, the policies issued by Evanston will be referred to as "the Evanston Policies" when they are discussed separate from the other Excess Policies). In addition to being identified as "Excess Liability Insurance," the Evanston Policies stated their purpose was "[t]o indemnify the Insured for the amount of excess net loss which is in excess of the underlying limits" described in the policy. As would be expected of excess coverage, the Evanston Policies also required Plaintiff to maintain insurance, and specifically referred to the applicable Primary Policy as the "controlling underlying policy."

Prior to the 1996-97 policy, the Evanston Policies defined "excess net loss" to mean "all sums which the Insured shall become legally obligated to pay as damages arising out of the hazards described . . but only to the extent that such hazards are insured by the controlling underlying policy . . . [and] excludes all loss expenses, legal expenses (including attorney's fees, court costs and interest on any judgment or award), . . . ." The definition was changed (at Plaintiff's request) for the 1996-97 and 1997-98

3

policies to "include loss expense and legal expenses for attorney's fees, court costs and interest on any judgment or award if covered by the controlling underlying policy."

In 1996, Plaintiff obtained two more layers of excess coverage (over and beyond that which was provided by Evanston). The next layer was provided by Defendant American International Specialty Lines Insurance Company ("AISLIC") and the layer after that was provided by Defendant Lexington Insurance Company ("Lexington"). Both AISLIC and Lexington are affiliates of AIG.

### C. The Underlying Actions

Beginning in March 1993, Plaintiff was named a defendant in several lawsuits around the country raising a variety of allegations about Plaintiff's Refund Anticipation Loan program ("RAL"). This program expanded on Plaintiff's Rapid Refund Program by adding an option to obtain a funds sooner than was possible even under the Rapid Refund Program by extending a short term loan in the amount of the customer's anticipated tax refund, less fees. In other words, a customer could seek a Rapid Refund with or without obtaining a Refund Anticipation Loan; without a loan, a refund could be expected in two to three weeks, but a loan would put money in the customer's hands in two to three days. Most of these suits asserted the following claims in connection with Plaintiff's offers and inducements to customers regarding the RAL program: fraudulent misrepresentations, fraudulent omissions, breach of fiduciary duty, and violations of the Truth in Lending Act. Some of the suits were class actions, and some of the suits have settled.

Evanston contends that a suit filed in 1990 was actually the first to raise a claim regarding the RAL program; Plaintiff disagrees. This contention is discussed in greater detail in Part II(B)(1), below.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### A. Series of Related Wrongful Acts

The parties offer different interpretations of the Primary Policies' "Series of acts" provision, with Defendants arguing it precludes coverage because all claims involving the RAL program constitute or arise from a series of related acts, so all claims are deemed to have occurred in 1990 when the first suit asserted problems in the RAL program. Consequently, Plaintiff's claims are untimely. The Court does not agree with Defendants' interpretation.

The clause reads as follows:

> **Series of acts.** Any damages incurred because of a wrongful act or a series of related acts occurring over more [than] one Policy Period shall be

5

> treated as a single claim. The claim will be subject to the limit in effect at the time of the first reported wrongful act.

The subject of the first sentence is not "wrongful acts" or "series of related acts," but rather "damages." The provision simply declares that all damages incurred by a claimant are treated as a single claim, regardless of whether those damages were caused by a single act or a series of related acts. It further states the claim for those damages shall be deemed to occur "at the time of the first reported wrongful act." The clause is a limit on liability (as befits its placement in the Primary Policies under the heading "Limits of Coverage") and not a directive regarding the timing for filing claims. The clause does not operate in the manner posited by Defendants, so their argument is rejected.

## B. Prior Acts

### *1. The Evanston Policies*

The Primary Policies require a claim to both occur and be presented to the insurer within the coverage period, and provides for coverage when the claim is predicated on acts occurring prior to the coverage period only if Plaintiff lacked knowledge or a reason to know that a claim might be raised. The Excess Policies "follow form," so this provision also applies to the Excess Policies. In most cases, the Underlying Actions were predicated on events occurring prior to the policy period in which the Underlying Action was filed. Evanston argues Plaintiff knew of a problem with the RAL program with the filing of the initial suit in 1990, so all of these suits are barred. The Court disagrees.

The 1990 case (designated by the parties as "the Washington Action") was initiated by Valerie Boykin Bonds. Bonds filed her suit in Illinois state court in February 1990. However, Bonds did not obtain a refund anticipation loan; she only sought a rapid refund, but claimed the "rapid refund" did not arrive by the date promised. Additional plaintiffs joined Bonds' suit. Then, in April 1990, several new plaintiffs

6

Case 4:03-cv-00904-SOW   Document 246   Filed 03/24/06   Page 6 of 18

(including Darlene and Manual Washington) were joined as plaintiffs, and the First Amended Class Action Complaint was filed. It is true that this pleading included references to the RAL Program, but the allegations were of a different nature than those presented in the other Underlying Actions. The factual allegations centered around the use of loans as an option customers might choose to obtain access to funds sooner than other options, and the legal allegations involved (1) miscalculation of the APR on the loans and (2) the timeliness of the processing of those loans.

Even if these claims are the same as those asserted in the next lawsuit (and the Court is not convinced they are), the fact that a single lawsuit has been filed is insufficient to put a party on notice that a second lawsuit will be filed. Just because customers dealing with an office in Illinois assert wrongdoing does not give a business reason to know that customers dealing with another office will also assert wrongdoing – particularly wrongdoing of a different nature. In fact, it took almost two years before another claim was asserted, which lends credence to the Court's conclusion Plaintiff did not have reason to know additional suits would be filed. The Court thus concludes the Washington Action did not provide Plaintiff with a reason to know that additional actions would be filed.

## *2. The AISLIC Policy*

The Court reaches a different conclusion with respect to AISLIC's policy.[3] By the time Plaintiff first obtained the second layer of excess coverage from AISLIC in May 1996, twelve of the Underlying Actions had already been filed. Included among these were at least four class actions. These facts demonstrate Plaintiff had reason to know that additional claims would be filed when it obtained coverage from AISLIC.

Plaintiff counters by pointing out it had no reason to know that any particular customer would file suit. This may be true, but it is not relevant. The Primary Policies

---

[3]Lexington did not raise this issue specifically, but the Court's ruling with respect to AISLIC inures to Lexington's benefit as well.

7

(including the National Union policy in place for 1996-97) provided coverage for claims based on wrongful acts occurring before the effective date of the policy if Plaintiff both (1) lacked knowledge of the wrongful act and (2) lacked a "reasonable way to foresee that a claim might be brought." The clause does not require Plaintiff to know the identity of the person(s) presenting the claim. On this record, Plaintiff had reason to know that additional claims would be filed by *somebody* when it obtained coverage from AISLIC.

## C. Duty to Defend/Defense Costs

Defendants argue they were not obligated to defend Plaintiff or to repay its defense costs. The Court agrees in part.

Until it was changed commencing with the 1996-97 policy, the definition of excess net loss in the Evanston Policies excluded defense costs and attorney fees. The definition in AISLIC's and Lexington's policies included defense costs. Evanston argues that the definition prior to the one in its 1996-97 policy obviates any obligation to repay Plaintiff's defense costs and attorney fees prior to that change. Plaintiff does not dispute this logic, and the Court agrees Evanston did not have a duty to repay Plaintiff's defense costs prior to the 1996-97 policy.

Plaintiff also contends Defendants had a full-fledged duty to defend. There are two flaws in Plaintiff's position. First, the provision Plaintiff relies upon does not create a free-standing obligation to defend; Defendants' obligation depends on the existence of an initial and fulfilled obligation on the primary insurer's part. The Excess Policies stated as follows (capitalizations in original, italics added):

> [I]f BOTH 1) the underlying limits are exhausted AND 2) the underlying insurer(s) owe(s) no *further* duty to investigate, defend or settle claims, THEN [the excess insurer] will assume the investigation, defense and settlement of claims for which coverage *would have otherwise been provided by the underlying insurer(s)*. THE COMPANY SHALL NOT BE OBLIGATED TO INDEMNIFY THE INSURED OR TO DEFEND OR TO CONTINUE TO DEFEND ANY CLAIM OR TO INCUR CLAIM EXPENSES

AFTER THE LIMIT OF THE COMPANY'S LIABILITY HAS BEEN
EXHAUSTED.

The reference to the underlying insurer's "further" duty requires reference to a duty on the primary insurer's part that existed at one time. Moreover, the final part of the first sentence requires the excess insurer to defend claims if the underlying policy would have provided for the same. In the absence of a duty to defend in the underlying policies, no such duty exists under the Excess Policies. As noted earlier, the Primary Policies did not contain a duty to defend; in fact, they expressly disavowed the existence of a duty to defend. Consequently, there could be no "further" duty to defend on the primary issuers' parts because there never was such a duty, and Defendants need only provide the same coverage for defense as the Primary Policies.[4]

Second, even if a duty to defend existed, the uncontroverted facts in the record demonstrate Plaintiff never tendered its defense to Evanston. Pasquini Dep. at 253-54; Lowery Dep. at 146-47, 152-53, 164-65, 208; Vasko Dep. at 359-60; Pasquini Dep. Exhibits 490, 493, 496 (letters from Vasko to Pasquini). Plaintiff requested reimbursement for defense costs, and requested payment of amounts paid to satisfy the underlying suits, but never asked Evanston to assume the actual defense of the lawsuits. This is consistent with Plaintiff's representations – made while trying to persuade Evanston to continue providing excess coverage – that Plaintiff generally preferred to handle its own defense. Vasko Dep. at 516-20 & Exhibit 863.[5]

Plaintiff contends it effectively requested Evanston provide a defense when it submitted copies of the underlying suits and requested payment for defense costs. However, by specifically failing to ask for a defense, and consistently couching its

---

[4]Plaintiff's reliance on the final sentence in the Excess Policies' provision is to no avail. That sentence does not purport to create any duties whatsoever; it only establishes the termination point of all duties that may exist under the Excess Policies.
It should also be pointed out that Endorsement #4 to AISLIC's policy specifically states AISLIC "does not, however, under this policy assume any duty to defend."

[5]These facts also appear in Evanston's Response to Plaintiff's Motion for Partial Summary Judgment. Plaintiff did not dispute these facts.

9

request as one seeking reimbursement of defense costs, the sequence of events cannot be construed as a request that Evanston assume responsibility for Plaintiff's defense. Providing a defense is a different (and more involved) obligation than merely reimbursing for defense costs, and requesting the latter does not invoke the former. Plaintiff relies on Trans World Airlines, Inc. v. Associated Aviation Underwriters, 58 S.W.3d 609 (Mo. Ct. App. 2001)[6] for the proposition that merely forwarding a copy of the underlying complaint or petition is sufficient to trigger a duty to defend. This is not the holding of the case; relying on prior decisions, the Missouri Court of Appeals reiterated that providing a copy of the charging document is ordinarily necessary to a tender of defense, but did not suggest this is all that is necessary. 58 S.W.3d at 620. Indeed, the court considered the course of conduct – both what was said and what was not said – to conclude the insured had not requested defense or indemnity prior to filing suit. Id. Here, Plaintiff (a sophisticated insured, to be sure) specifically requested indemnification and reimbursement of defense costs, specifically refrained from requesting Evanston provide it with a defense, and told Evanston that it prided itself on conducting its own defense. Under these circumstances, a tender of defense was not accomplished.

In light of these conclusions, Defendants are not obligated to provide Plaintiff with a defense in any of the underlying actions, and Evanston is not obligated to reimburse Plaintiff for its defense costs prior to the effective date of the 1996-97 policy.

### D. Failure to Maintain the Primary Policy for 1992-93 and 1993-94

The Evanston Policies require Plaintiff to maintain the Primary Policies "during the currency of his excess policy except for the exhaustion of any underlying aggregate limit of liability if such exhaustion is solely due to payment of claims insured in the underlying policy(ies) during the currency of this excess policy." In May 1995, Vasko wrote Mutual a letter requesting the letter of credit be released so the account could be

---

[6]All parties agree Missouri law governs this dispute.

closed. The letter also represented that "all claims are closed." Vasko Dep. Exhibit 849. However, the letter of credit was not cancelled until December 1999 – after Evanston denied coverage for the Underlying Actions. Evanston insists the fact the letter of credit was not cancelled is insufficient to demonstrate the policy was not cancelled. To the contrary, the party seeking summary judgment bears the burden of proving the absence of disputed facts. Evanston does not identify undisputed facts in the record demonstrating its entitlement to summary judgment on this issue. The Court cannot conclude Plaintiff failed to maintain the Primary Policy as required by the Evanston Policy.

As a fallback position, Evanston argues Plaintiff allowed the Primary Policies for 1992-93 and 1993-94 to expire before Mutual paid any sums. The reality, of course, is that the arrangement between Plaintiff and Mutual never required Mutual to pay any sums. Of more importance to the present inquiry, however, is the fact that the Evanston Policies did not require the payment of claims to be made by Mutual; it merely requires "payment of claims." Evanston is not in a position to insist upon payment from any particular source because its policy does not require payment from a particular source.

Additionally, the excess insurers do not have a stake in whether or how much the primary insurer actually pays. The excess insurers' sole interest is confirming their obligation is not invoked before the limits of the primary policy are reached. Whether those limits are actually paid does not affect the excess insurer. Evanston correctly observes the cases Plaintiff relies upon are factually distinguishable in that they discussed instances in which the primary insurer failed to pay because it was bankrupt or the primary insurer and the insured agreed to a settlement for an amount less than the primary policy's limits. E.g., Koppers Co. v. Aetna Cas. & Sur. Co., 98F.3d 1440, 1454 (3d Cir. 1996) (applying Pennsylvania law).[7] Even in the case of settlement for less than the policy limits, the excess carrier's obligation is not triggered until the

---

[7]The Seventh Circuit's decision in UNR Indus., Inc. v. Continental Cas. Co. is completely distinguishable because it relied on language in the excess policy that specified what was to happen if there was no primary insurance. 942 F.2d 1101, 1107-08 (7th Cir. 1991)

11

insured demonstrates covered losses exceeding those limits.  Id. at 1455.
Consequently, even if Mutual did not pay money (either out of its own coffers or a fund created by Plaintiff), Evanston's obligation was triggered if and when Plaintiff suffered more than the covered amount of covered losses.

### E.  Applicability of Primary Policies

As noted earlier, the definition of "excess net loss" in the Evanston policies dictated coverage existed only if, *inter alia*, the loss in question "is insured by the controlling underlying policy."  The other Excess Policies contained similar provisions.  Defendants argue the Underlying Actions are not covered by the Primary Policies.  The Court concludes that there is insufficient information in the record to allow for a determination at this juncture; moreover, the Court concludes its prior limits on discovery have prevented Defendants from ascertaining some of that information.

The Primary Policies promise reimbursement for amounts Plaintiff is "legally required to pay to compensate others for loss that results from an error, omission or negligent act committed in the conduct of [Plaintiff's] business."  The business activities to be covered are referred to as "specified operations" and are defined as follows:

> The performance of tax services, including, but not limited to, answering questions concerning taxes; providing tax information; preparing tax returns; filing tax returns electronically and in the traditional manner prepared by an insured or others; processing applications for refund anticipation loans; conducting seminars concerning taxes, writing workbooks, textbooks and other reference materials concerning taxes which are used in courses and seminars; and performing bookkeeping services [and the] granting of franchises for tax related services.

The difficulty is determining whether the Underlying Actions involve claims about the "specified operations."  This difficulty arises from two sources: insufficient information about the Underlying Actions and ambiguity in the Primary Policies.

An insurer's obligation to indemnify its insured is narrower than its duty to defend.  E.g., McCormack Baron Mgt. Servs., Inc. v. American Guarantee & Liability Ins. Co.,

12

989 S.W.2d 168, 170 (Mo. 1999) (en banc). "The duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependant on the probable liability to pay based on the facts ascertained through trial. The duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint." Id. (quotation omitted). In contrast, "[t]he duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement. The insurer's duty to pay arises only after the suit by the third party is successful and the insurer becomes obligated to pay the resulting judgment." McCormack Baron Management Services, Inc. v. American Guarantee & Liability Ins. Co., 989 S.W.2d 168, 173 (Mo. 1999) (en banc) (internal citations and quotations omitted). Frequently, both duties are at issue, so the analysis focuses on the broader duty to defend. Of course, in this Order the Court has held the excess insurers did not owe a duty to defend, thus necessitating a more searching inquiry into the nature of the Underlying Suits and their resolutions. The problem is that the Court's actions have stifled development of the record. Having no reason before now to doubt the existence of a duty to defend, the Court restricted Defendants' efforts to conduct discovery into the Underlying Actions, see, e.g., Order dated September 1, 2005, reasoning that such discovery was not relevant to determining the existence and scope of the duty to defend. The interests of justice require reopening discovery so Defendants can develop evidence relevant to this issue.

The second difficulty arises from ambiguities in the Primary Policies. Language in a policy is ambiguous if "there is duplicity, indistinctness, or uncertainty in the meaning of the words used." Rodriguez v. General Accident Ins. Co. of Am., 808 S.W.2d 379, 382 (Mo. 1991) (en banc). The ambiguity involves the meaning of the "specified operations." The phrase is intended to encompass "tax services" and list of examples is provided. The most applicable example appears to be "processing applications for refund anticipation loans," but it is not clear whether this example applies in this case. The Underlying Actions do not contend Plaintiff failed to properly process an application (by, for instance, failing to complete the processing or failing to

13

properly complete the necessary paperwork); rather, the Underlying Actions contend Plaintiff committed fraud in the marketing and sale of refund anticipation loans.  It is not clear that fraudulent inducement to take out a loan can be considered or equated with failure to properly process the loan's paperwork, particularly in the context of what is ostensibly a professional errors and omissions policy.

       Plaintiff attempts to avoid this ambiguity by arguing the phrase "including but not limited to" demonstrates the breadth of "specified operations," and the Court should not focus solely upon the illustrations.  This argument only fuels the Court's conclusion.  If the illustrations are to be treated as mere examples, the definition of "specified operations" reduces to "tax services" – and it is not clear that representations made to induce people to apply for refund anticipation loans can be considered "tax services." Plaintiff also argues that any ambiguity should be construed in its favor because the contract in question is one of insurance.  As noted earlier, the Court is not at all convinced this policy can rightly be considered insurance.  Even if it is, the rule of interpretation Plaintiff relies upon may not be justified in this case.  This rule of interpretation is grounded on the notion that the insurer prepares the contract, so the insurer should bear the penalty of any ambiguities.  State ex rel. Western Automobile Ins. Co. v. Trimble, 249 S.W. 902, 906-07 (Mo. 1923) (en banc).  Courts ordinarily do not delve into the give and take of negotiations between an insurer and an insured, but if these are "insurance" policies they certainly are not ordinary ones.  Hesitation is justified both because the purported insured was allowed to be its own claims administrator and because the purported insurer is not financially responsible for paying claims.  In reality, the primary insurers don't care what the policies say or what they cover, and have no vested interest in arguing for a narrower construction than Plaintiff would like to bestow upon the Primary Policies.  Finally, it is not even clear the insurance companies wrote the policies in question: the Primary Policies are virtually identical even though they were issued by three different companies.  The few differences either (1) relate solely to changes in identifying the different insurers or (2) raise questions of their own.  For example, each Primary Policy has the same Table of Contents, including an indication that the topic of "Jurisdiction" is found on page 6.  The

14

discussion of Jurisdiction related specifically to Mutual and provided that the law of Bermuda applies and "[a]ny finding of jurisdiction by any court outside of Bermuda in any action in connection with this Policy to which [Plaintiff] is a party, shall render this Policy void, <u>ab initio</u>."[8]  The policies issued by AIG's affiliates contain no discussion of "Jurisdiction," even though the Table of Contents – like the one from Mutual's policies – indicates the matter is addressed on page 6.  This suggests Mutual's policy was simply replicated for use by AIG's affiliates, but the editing to make the changes necessary to reflect the change in insurers was faulty – and that the insurers did not have their customary role in drafting the documents.  <u>See also</u> Sullivan Dep. at 123-24, 219 (suggesting Plaintiff drafted the definition of "specified operations" as well as other provisions).  Minimally, it is appropriate to allow Defendants to conduct discovery about the meaning ascribed by the parties to the Primary Policies and the drafting process.

Finally, Defendants argue certain exclusions (most notably the exclusion for "dishonest, fraudulent, criminal or malicious acts" and for claims "relating to unlawful profits") prohibit coverage in this case.  Many of Plaintiff's responses are premised on the broad duty to defend it believed applied to this case, but the Court's ruling changes the nature of the discussion.  The Court declines to consider the exclusions at this juncture.

### F.  Calculation of Self-Insured Retention

The Primary Policies required Plaintiff to pay a Self-Insured Retention ("SIR") before the insurers' obligations were triggered.  Under the Mutual policies and the first National Union policy, the SIR was "$2,500 per wrongful act" with a "$25,000 Total

---

[8]One wonders whether this suit is "in connection with" the policy Mutual issued.  While Mutual is not a party and the suit does not seek recovery under the policy Mutual issued, there is no doubt that the ordinary meaning of the word suggests this suit is "connected" to the Mutual policy.  If this is so, and if the policy was truly "void ab initio," then Plaintiff effectively failed to maintain a primary policy as required by the excess policies.
No party has raised this argument, so the Court will not dwell on it further.

Limit." However, commencing with the 1995-96 policy, the SIR was "$2,500 per wrongful act" without any limits. Defendants contend Plaintiff incorrectly applied the SIR to the individual lawsuits instead of applying the SIR to each customer who alleged wrongdoing. Plaintiff justifies its calculations in three ways, none of which are convincing.

First, Plaintiff contends neither AIG nor its affiliates objected to the manner in which the SIR was calculated. This argument is hardly compelling, given Plaintiff was responsible for administering the insurance claims. Moreover, given that AIG and its affiliates were not financially responsible for paying the claims, little (if any) credence should be given to anything AIG or its affiliates did (or did not do). Second, Plaintiff contends Evanston did not object to its method of calculating the SIR. It is not clear when Evanston had such an opportunity, but this is of little importance; of greater importance is the lack of any occasion when Evanston was *obligated* to raise this objection. Plaintiff seems to be advancing some sort of a waiver argument, but a waiver could not occur absent a requirement that the argument be raised sometime before this litigation. Finally, Plaintiff argues the Evanston Policies apply the SIR due under them to each claim and not each wrongful act. This is irrelevant; the question is whether Plaintiff has properly applied the SIR under, and exhausted the coverage provided by, the Primary Policies – a necessary precondition to any claim on the Excess Policies.

The phrase "wrongful acts" is defined in the Primary Policies to encompass the errors, omissions and negligent acts covered by those policies. The phrase is not defined to mean "lawsuits filed against the insured." Consequently, the application of a SIR in the amount of "$2,500 per wrongful act" means Plaintiff must pay a reserve of $2,500 for each error, omission or negligent act before the Primary Policy provides coverage and not simply $2,500 per lawsuit. Plaintiff has calculated the SIR incorrectly.

## G.  Vexatious Refusal to Pay

Defendants seek summary judgment with respect to Plaintiff's claim for vexatious refusal to pay. The Court's decision partially vindicates Defendants' decisions, so it is

16

tempting to grant their request. However, there are too many unresolved issues to persuade the Court that the undisputed facts demonstrate Defendants' entitlement to judgment at this juncture.

### H. Issues Unique to AISLIC and Lexington

Two additional arguments unique to AISLIC and Lexington require further discussion. First, as a general proposition, Plaintiff observes that National Union, American Home, AISLIC and Lexington are all affiliates of AIG, then discusses them as if they are all the same entity. Plaintiff then attaches significance to the fact that "AIG" found coverage to exist under the Primary Policies but now takes a contrary position with respect to the Excess Policies.

The Court does not know what the parties mean when they describe these companies as "affiliates" of AIG. By all appearances, each of these entities is a separate, distinct corporation. Plaintiff offers nothing other than their "affiliation" to justify treating them as one entity, and the Court does not believe there is any legal justification for doing so. Moreover, even if these insurers were viewed as a single entity, Plaintiff offers no authority supporting its insinuation that they are estopped from denying coverage under the Excess Policies.

Second, Plaintiff offers this same argument in response to AISLIC's contention that Plaintiff failed to provide certain notifications as required by the policy. While the Court is not overly impressed with Plaintiff's position, the record is insufficient to allow the Court to reject it out of hand. For the present, the Court declines to rule on AISLIC's argument.

### III. STATUS OF THE CASE

At this juncture, it may be helpful for the Court to describe the status of the case in light of the rulings announced today. The Court's determinations regarding defense costs and application of the SIR greatly affects the amount of Plaintiff's claim. These

determinations may even truncate matters by preventing Plaintiff from exhausting the Primary Policies, thereby preventing it from even reaching the Excess Policies.

Assuming Plaintiff reaches the Excess Policies, the next inquiry will be whether the Underlying Actions assert claims that are covered by the Primary Policies and not barred by any of the policies' exclusions. At a minimum this will require discovery into (1) the meaning of certain ambiguous provisions in the Primary Policies and (2) the nature of the Underlying Actions. Finally, even if the Primary Policies are exhausted, the second and third layers of excess coverage will not apply because Plaintiff had reason to know these claims would be asserted when it obtained coverage.

Clearly, the parties have more work to do; calculations must be made and discovery must be conducted. The parties shall have until and including June 30, 2006, to conduct any discovery they deem necessary consistent with this Order. Dispositive motions shall be filed on or before July 31, 2006. The Court will reschedule the pretrial conference and trial at a later time.

### III. CONCLUSION

For these reasons, the cross motions for summary judgment are granted in part and denied in part.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: March 24, 2006      UNITED STATES DISTRICT COURT